# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO  DIVISION

|  |  |  |
|---|---|---|
| | * | |
| JEANE L. DINTELMAN | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| VS. | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | NO: 3:07CV00081   SWW |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Counter Claimant | * | |
| | * | |
| VS. | * | |
| | * | |
| JEANE L. DINTELMAN and JIM L. DINTELMAN | * | |
| | * | |
| | * | |
| Counter Defendants | * | |
| | * | |
| | * | |
| | * | |
| | * | |

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

## and ORDER DIRECTING PROPOSED JUDGMENT

Plaintiff Jeane L. Dintelman commenced this suit for return and abatement of trust fund recovery penalties assessed by the Internal Revenue Service ("IRS") for willful failure to collect, account for, and pay over federal employment taxes.  The United States counterclaimed, seeking unpaid trust fund recovery penalties assessed against Plaintiff and Jim L. Dintelman

("Dintelman"), Plaintiff's former spouse.[1]  By order entered June 27, 2008, default judgment was entered against Dintelman.

Plaintiff's claims against the United States proceeded to a bench trial held January 23, 24, and 25, 2012.  The Court now reaffirms and augments findings of fact and conclusions of law, stated from the bench at the conclusion of trial in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## I.  Statutory Background

The Internal Revenue Code requires employers to withhold income and Federal Insurance Contribution Act, FICA,  taxes from the wages of employees, when those wages are paid.  *See* 26 U.S.C. §§ 3102(a), 3402(a).  Withheld amounts, commonly referred to as trust fund taxes, "shall be held to be a special fund in trust for the United States," *see* 26 U.S.C. § 7501, and the willful failure to pay over trust fund taxes to the United States subjects a responsible person to personal liability.   *See* 26 U.S.C. § 6672.

Title 26 U.S.C. § 6672(a) provides in pertinent part as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Section 6672(a) imposes liability on any person, also known as a "responsible person," who is under a duty to collect, truthfully account for, or pay over taxes.  *See Slodov v. United States*, 436 U.S. 238, 249, 98 S. Ct. 1778, 1786 (1978)(holding that a "responsible person" is one

---

[1]The Court will refer to Plaintiff Jean L. Dintelman as "Plaintiff," and Counter Defendant Jim L. Dintelman as "Dintelman."

who has a duty to perform at least one of the three functions listed under § 6672).  Furthermore,

§ 6672(a) imposes joint and several liability, and more than one person may be a "responsible

person" subject to liability.  *See Elmore v. United States*, 843 F.2d 1128. 1134 (8th Cir. 1988).

## II.  Findings of Fact

Plaintiff and Dintelman were married in 1982, and in 1986, the couple moved to a rural

area in southern Arkansas.   As described by Dintelman, the couple's life was beautiful, and they

"lived off the grid" for approximately 18 years–raising animals, growing gardens, and heating

their small home by burning wood from trees that they cut down.  Dintelman worked as a

machine operator, and he dominated the family's financial decisions.  Plaintiff  testified that

Dintelman was a "massive control freak," who gave her $100 per week to buy food for the

family.

Plaintiff home-schooled the couple's three children and sold clothes that she sewed.

Despite her husband's domineering tendencies, Plaintiff managed to take a few college classes,

and in 1999, she  completed an emergency medical technician-basic ("EMT-basic") course at a

nearby vocational school.  After becoming an EMT-basic, Plaintiff began working for an

ambulance service operated by Dallas County Hospital.  In 2000, Plaintiff earned a paramedic

license, and she  continued working for Dallas County Hospital.

In 2002, the Dintelmans started an ambulance service business, Elite Medical Services,

Inc. ("EMS").  According to Dintelman, he and Plaintiff had dreamed of working together, and

he started EMS as a Valentine's Day present to his wife.  Plaintiff and Dintelman each owned

50% of EMS, and they named themselves as the sole corporate officers.  Articles of

incorporation for EMS, dated February 14, 2002, were completed in Plaintiff's handwriting and

3

signed by her as president of EMS.  Also in February 2002, Dintelman opened a checking

account in the name of EMS, for which both he and Plaintiff had single, signatory rights.

EMS began its existence with no capital and without formalities such corporate bylaws,

directors' meetings, or the issuance of stock certificates.  EMS did not immediately engage in

ambulance service operations, and Plaintiff  continued working as a paramedic for Dallas County

Hospital.

In June 2002, the Dintelmans separated, and Plaintiff began a long-distance, romantic

relationship with Steve Krakowski ("Krakowski"), who lived in Texas.  However, the

Dintelmans' separation did not stop them from moving forward with EMS.  In order to obtain a

license to provide ambulance services, EMS needed a protocol handbook.  Dintelman obtained

copies of other ambulance companies' handbooks, which Plaintiff used to create EMS's protocol

handbook.

In July 2002, Dintelman signed a "memo of understanding" with James Pafford, the

owner of Pafford Emergency Medical Services.  The memo provides that in exchange for

$172,731.20, Pafford would sell EMS six ambulance units and sign a portion of Pafford's

ambulance service contracts over to EMS.   To pay Pafford, Dintelman obtained $140,000 by

transferring land to his brother.  Dintelman testified that pursuant to Pafford's instructions, he

drove to a parking lot in Magnolia, Arkansas, and handed over to Pafford's daughter a brief case

containing $140,000 in cash.  Plaintiff reports that she learned about the cash transaction

between Dintelman and Pafford sometime after it occurred.

EMS began ambulance service operations in October 2002, without sufficient funds to

pay employees or other obligations as they became due.  The company also encountered

difficulty receiving timely insurance reimbursements.  In search of cash, Dintelman consulted an

accounts receivable factoring company, Funding Resources, Inc. ("Funding Resources").  On

November 22, 2002, Dintelman met a representative of Funding Resources at a Memphis airport,

and he signed several agreements: an accounts receivable purchase agreement, a limited power

of attorney, and a security agreement.  Plaintiff was not present at the airport meeting, and

Dintelman signed Plaintiff's name on the aforementioned documents.  Dintelman testified that he

does not recall whether he told Plaintiff about the factoring agreement at the time it was entered.

When EMS began operations in October 2002, Plaintiff ceased working for Dallas

County Hospital and began working full time as a paramedic for EMS.  On her days off, Plaintiff

frequently visited Krakowski in Austin, Texas.  Often, the Dintelmans' children accompanied

Plaintiff on her visits to Texas, and Dintelman was aware of his wife's relationship with

Krakowski.

In addition to working as an EMS paramedic, Plaintiff retained the titles of chief

executive officer ("CEO") and  president of EMS, and she represented to EMS employees and

the public that she was the CEO and president of EMS.  On December 17, 2002, Plaintiff

executed a two-year ambulance service agreement with the City of Lake Village, signing the

agreement both individually and in her capacity as president of EMS.  Dintelman also signed the

agreement individually, but not in his capacity as an officer of EMS.

Although Dintelman signed the majority of checks written on EMS's bank account,

Plaintiff exercised her check-writing authority during each tax period at issue in this case.

Additionally, unlike other paramedics who worked for EMS and who were paid by the shift they

worked,  Plaintiff received a salary that was equal to Dintelman's.

EMS failed to timely file its employment tax return, IRS Form 941, for the fourth quarter of 2002 (due on January 31, 2003) and the first quarter of 2003 (due on April 30, 2003), and it failed to deposit taxes withheld from EMS employees' paychecks, as required by law.

In April 2003, Plaintiff contacted the Small Business Administration, which referred her to Tina Powis-Dow ("Powis-Dow"), a business consultant for a non-profit organization that provides management services to small businesses. Powis-Dow recalls that Plaintiff contacted her on behalf of EMS for the purpose of implementing a computerized accounting system with QuickBooks software. However, Plaintiff testified that she consulted Powis-Dow solely because she desired personal knowledge, and she was not seeking information that would assist her in managing EMS. As stated from the bench, the Court does not find credible Plaintiff's testimony regarding her reason for consulting Powis-Dow. The evidence shows that after Plaintiff consulted Powis-Dow, Powis-Dow visited EMS's corporate office in her capacity as a business consultant to discuss the implementation of QuickBooks software for EMS, and she billed EMS for her services.

In the normal course of her duties as a small business consultant, Powis-Day recorded time spent with clients, including the Dintelmans. Powis-Dow's time-keeping records show that she met with the Dintelmans four times. On April 29, 2003, Powis-Dow met with Plaintiff and Dintelman in a trailer behind EMS's office in Hamburg, Arkansas. According to Powis-Dow, Plaintiff and Dintelman both participated in the meeting and expressed that they wanted to keep better track of EMS's income, expenses, assets, and liabilities.

On May 13, 2003, Powis-Dow met with the Dintelmans again. According to Powis-Dow, Dintelman disclosed that EMS was experiencing cash flow problems. Powis-Dow recalls

that Plaintiff became very upset during the meeting and began asking Dintelman questions about the company's financial problems.

On May 20, 2003, Powis-Dow held a third meeting with the Dintelmans.  Powis-Dow testified that during the meeting, she inquired about EMS's payroll tax balance, and Dintelman responded that EMS was behind on payroll taxes, which caused Plaintiff to become very upset. However, Plaintiff testified that Dintelman refused to provide Powis-Dow any information regarding EMS's financial state, and she denied that Dintelman revealed the status of EMS's payroll tax liability during the May 20 meeting.

As stated from the bench, the Court finds, by a preponderance of the evidence, that Plaintiff learned, at least by May 20, 2003, that EMS had failed to pay over payroll taxes.   The Court further finds that after Plaintiff learned about the delinquent payroll taxes, she continued to write checks on EMS's bank account, to herself for reimbursement for items purchased for EMS and to other creditors, and she had knowledge that Dintelman made payments to creditors, other than the IRS, after May 20, 2003.  The parties stipulate that EMS paid out $957,119.21 to creditors other than the IRS after May 20, 2003.

Powis-Dow's fourth and final meeting with the Dintelmans occurred on June 4, 2003. Powis-Dow recalls that she asked Dintelman for information necessary to set up accounting software, and Dintelman refused to provide account balances.  According to Powis-Dow and Plaintiff, Plaintiff and Dintelman engaged in a heated argument, and Plaintiff left the meeting.

EMS failed to timely file its third quarterly employment tax return (due on July 31, 2003), and  it failed to deposit taxes withheld from employees' paychecks, as required by law.

In August 2003, Plaintiff demanded that Dintelman hire her boyfriend, Krakowski, as a

7

bookkeeper and chief financial officer ("CFO") of EMS.  Subsequently, Krakowski moved to

Arkansas and became a signatory on EMS's checking account.  Dintelman testified that he was

so impressed with Krakowski that he independently decided to hire him as CFO.  As stated from

the bench, the Court does not find Dintelman's testimony on this point to be credible and further

finds that Plaintiff insisted that Krakowski be hired.

On August 15, 2003, the Dintelmans borrowed an additional $25,000 from Funding

Resources, and they both signed a related promissory note and mortgage.  The mortgage bearing

Plaintiff's signature states that it is given to secure repayment of the aforementioned $25,000 in

addition to EMS's obligations under the factoring agreement entered on November 22, 2002.

According to Plaintiff, she had no part in negotiating the $25,000 loan, and she signed the

promissory note and mortgage at Dintelman's instruction.

On August 24, 2003, the IRS sent EMS notice that revenue officer Stephanie Ridgell

("Ridgell") had been assigned the task of collecting EMS's tax debt.   On October 8, 2003,

Ridgell visited EMS's  office in Hamburg, and she met with Plaintiff, Dintelman, and

Krakowski.   According to Plaintiff, the first time she learned that EMS had failed to pay taxes

was immediately before the meeting, when Dintelman told her that  Ridgell was coming.

Ridgell asked the Dintelmans questions about EMS, and she completed IRS Form 4180

(Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal

Liability for Excise Tax) ("the Form") in her own handwriting.  The Form lists Plaintiff as CEO,

president, and 50% shareholder of EMS and states her that her duties for EMS include human

resources, public relations, and "other services."

Section II of the Form, entitled "Ability to Direct," inquires whether the interviewee

performed duties and functions listed separately, and it provides "yes" and "no" check-off boxes beside each duty and function listed.   Ridgell's checkmarks and notations indicate that both Plaintiff and Dintelman performed the following functions for EMS from February 2002 through October 8, 2003:  hire/fire employees, manage employees, direct (authorize) payment of bills, deal with major suppliers, open close corporate bank accounts, sign corporate checks, make/authorize bank deposits, and authorize payroll checks.

Finally, in response to the inquiry: "When and how did you first become aware of the delinquent taxes?," the Form reads: "Jeane-several months ago due to lack of knowledge about business."   The Court finds that the foregoing statement is consistent with the Court's finding that Plaintiff learned about the delinquent payroll taxes on May 20, 2003.

Plaintiff claims that she told Ridgell several times that information recorded on the Form was incorrect, but she signed it because Ridgell told her she had no choice.  Plaintiff's and Dintelman's signatures appear on the Form under the following, bold-lettered statement: "I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true, correct, and complete.  *See* docket entry #83, Ex. #5.  Above the bold-lettered statement, the Form contains a section entitled "Additional Comments" with several blank lines and instructions stating: "Please add any comments you may which to make regarding this matter."  Dintelman added handwritten comments, but Plaintiff, who witnessed Dintelman writing his comments, contends that she did not know she could have done the same.

The Court finds that Plaintiff received and declined an opportunity to add her written comments to the Form.  However, based on Ridgell's testimony, the Court finds that in completing Section II of the Form, Ridgell considered Plaintiff's titles as CEO and president,

9

rather than Plaintiff's actual conduct related to EMS.   Accordingly, the Court will look to evidence other than information contained in Section II of the Form to determine the extent of Plaintiff's authority over EMS business and whether she was a "responsible person" within the meaning of § 6672.

Elite failed to timely file its fourth quarterly employment tax return (due on November 14, 2003), and it failed to deposit taxes withheld from employees' paychecks as required by law.

Plaintiff filed for a divorce from Dintelman on December 16, 2003, and a final divorce decree was entered July 7, 2004.  A property agreement filed along with the divorce decree provides that "the parties are owners, jointly and equally of an emergency services business, Elite Medical Services."  Shortly after the divorce Jeane moved to the vicinity of Oxford, Mississippi,  with her law-student daughter, and began working as a medical billing agent. Presently, Jeane is sole owner of a medical billing company, and she provides billing services for EMS.

On September 6, 2004, the IRS  assessed trust fund recovery penalties against Plaintiff and Dintelman for unpaid payroll taxes of EMS for tax periods ending December 2002, March 2003, June 2003, and September 2003.   After paying a portion of the assessment due, Plaintiff commenced this action seeking a refund and abatement of the unpaid balance, alleging that she does not qualify as a "responsible person" who "willfully" failed to collect, account for, or remit payroll taxes to the United States.   According to Plaintiff, she was the CEO of EMS in name only, and she had no control or authority over any aspect of EMS operations.

The IRS filed a counterclaim against Plaintiff and Dintelman, seeking to recover the balance of the aforementioned  assessment.   The Court entered a default judgment against

Dintelman on June 27, 2009, and since then, he has made monthly payments pursuant to a
settlement agreement.   Accounting for payments made by Jim Dintelman pursuant to his
settlement agreement with the United States, the IRS reports that the remaining unpaid
assessments in this matter relate to the second and third  quarters of 2003, which as of November
28, 2011 totaled $58,371.80.

### III.  Conclusions of Law

An IRS assessment under § 6672 is presumed correct, and it is Plaintiff's burden to show,
by a preponderance of the evidence, that she was not a responsible person or did not willfully fail
to pay over taxes.  *See Riley v. United States,* 118 F.3d 1220, 1221 (8th Cir. 1997).


A "responsible person" under § 6672 is someone who has "'the status, duty and authority
to avoid the corporation's default in collection or payment of taxes.'" *Ferguson v. United States*,
484 F.3d 1068, 1072 (8th Cir. 2007)(quoting *Baron v. United States*, 988 F.2d 58, 59 (8th Cir.
1993)(quoting *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991)).   "As the case law
makes abundantly clear, a person's 'duty' under § 6672 must be viewed in light of his power to
compel or prohibit the allocation of corporate funds." *Godfrey v. United States*, 748 F.2d 1568,
1576 (8th Cir. 1984).   Signs of a "responsible person" in this context include holding a corporate
office, control over financial affairs, the authority to disburse corporate funds, stock ownership,
and the ability to hire and fire employees.   "[W]here a person has authority to sign the checks of
the corporation, or to prevent their issuance by denying a necessary signature, or where that
person controls the disbursement of the payroll, or controls the voting stock of the corporation,
he will generally be held 'responsible.'" *Godfrey,* at 1576 (internal citations omitted).

11

Whether a person is responsible under § 6672 is a matter of substance, not form. *Id.* To trigger liability under § 6672, a person must have significant decision-making authority over the corporation's tax matters, and a person's technical authority to sign checks and duty to prepare tax returns are not enough to make the person responsible under § 6672. *See Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991).

Here, Plaintiff claims that Dintelman kept a tight rein over EMS's  monetary transactions and kept her out of the decision-making process.  However, Plaintiff cannot escape liability as a "responsible person" simply by surrendering her rightful authority or delegating duties to another. *See Keller v. United States*, 46 F.3d 851, 854 (8th Cir. 1995)(noting that an otherwise responsible person does not avoid liability under § 6672 by delegating authority to another). The evidence shows that Plaintiff owned fifty percent of EMS; held herself out as the CEO of EMS to EMS personnel and others; exercised her authority to write checks on the corporation's bank account;  represented EMS before the Lake Village City Council; entered a contract with Lake Village on behalf of EMS; received a salary equal to the salary received by Jim Dintelman, who also served as a corporate officer; sought advice from a business consultant regarding accounting software for EMS; and asserted her authority to hire Steven Krakowski as the CFO of EMS.

Plaintiff did not consistently exercise her power and authority as president and CEO of EMS, and she relinquished her rightful authority to Dintelman, who by all accounts was domineering and controlling.   However, it is clear that from the time EMS began operations in October 2002, Plaintiff possessed  the status, duty, and authority to avoid the corporation's default in the collection and payment of payroll taxes.  As such, the Court finds that Plaintiff has

12

failed to meet her burden to establish by a preponderance of the evidence that she was not a responsible person within the meaning of § 6672.

A "responsible person" acts "willfully" under § 6672 if he or she "'acts or fails to act consciously and voluntarily and with knowledge or intent that as a result of his [or her] action or inaction trust funds belonging to the government will not be paid over but will be used for other purposes, or by proceeding with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the government.'" *Ferguson v. United States*, 484 F.3d 1068, 1072 (8th Cir. 2007)(quoting *Keller v. United States*, 46 F.3d 851, 854 (8th Cir. 1995)(quoting *Honey v. United States*, 963 F.2d 1083. 1087 (8th Cir. 1992)). "Evidence that the responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law." *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir.1991).

The Court finds by a preponderance of the evidence that on May 20, 2003, Plaintiff was aware that EMS had failed to pay over payroll taxes.   The Court further finds that after Plaintiff learned about the delinquent payroll taxes, she continued to write checks on EMS's bank account, to herself and non-IRS creditors, and she had knowledge of additional payments to other non-IRS creditors, including herself and EMS employees.   The Court finds that Plaintiff willfully failed to pay over EMS's trust fund payroll taxes due to the United States.

### IV.  Order Directing the Parties to File a Proposed Judgment

Because Plaintiff has failed to meet her burden in this case, the Court finds that her claims should be  dismissed with prejudice and that judgment should be entered in favor of the United States for the balance of trust fund penalties assessed against her, along with accrued and

unassessed interest and penalties until the judgment is paid.

IT IS THEREFORE ORDERED that the parties are directed to submit an agreed, proposed judgment, within ten (10) days from the entry date of this order, that conforms to the Court's conclusions of law.  If the parties are unable to submit an agreed judgment, the United States shall submit a proposed judgment within ten (10) days from the entry date of this order, and Plaintiff shall submit her objections within five days thereafter.

IT IS SO ORDERED THIS 3RD DAY OF FEBRUARY, 2012.


/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE